**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  21-CR-20245-BLOOM**

**UNITED STATES OF AMERICA**

**vs.**

**NOEL QUINTANA,**

    **Defendant.**
_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America submits this sentencing memorandum pursuant to Rule 32 of the Federal Rules of Criminal Procedure. For the reasons set forth herein, the United States respectfully requests the Court sentence Noel Quintana ("N. Quintana" or "Defendant") to serve a guideline sentence of 57-71 months in prison followed by three years' supervised release. The government requests that Defendant be prohibited from engaging in import/export business of any kind and in any manner as a condition of supervised release. The government further requests that the Court enter a preliminary order of forfeiture as stipulated in the Plea Agreement [DE100] ("PA") and order Defendant to pay the storage costs for the illegal wood.

## FACTUAL & LEGAL BACKGROUND

### 1. Legal Framework

Duties, Tariffs, and Import Documentation Requirements

At various times, the United States government imposed countervailing and anti-dumping duties on goods imported into the United States from the People's Republic of China ("China"), to prevent China from selling goods at uncompetitive prices in the United States.  Countervailing duties are tariffs levied on imported goods to offset subsidies made to

producers of those goods in the foreign country. Anti-dumping duties are protectionist tariffs that a domestic government imposes on foreign imports that it believes are priced below fair market value.

Specifically, from on or about April 25, 2017, through on or about August 22, 2017, and from on or about December 20, 2017, through the date of this Indictment, countervailing duties order C-570-052 was effective in the United States and imposed a duty of 22.98% on all hardwood plywood imported into the United States, including high pressure laminate or HPL plywood, for which the country of origin was China.

From on or about June 23, 2017, through on or about December 19, 2017, and from on or about December 27, 2017, through the date of this Indictment, anti-dumping order A-570-051 was effective in the United States and imposed a duty of 183.36% on all hardwood plywood imported into the United States, including high pressure laminate or HPL plywood, for which country of origin was China.

These anti-dumping and countervailing duties did not apply to softwood plywood from China, nor to hardwood plywood from countries other than China.

Plywood with both outer plies of coniferous wood (softwood), regardless of country of export, carried a general duty of 8%, with a few exceptions. One such exception was that plywood containing an outer ply of Parana pine *(Araucaria angustifolia)* was duty free.

In addition, on September 28, 2018, a 10% tariff was imposed on all plywood from China under Section 301 of the Trade Act of 1974. Section 301 tariffs are imposed following a finding of an unfair trade practice by another country. This Section 301 tariff was increased to 25% effective May 10, 2019.  84 Fed. Reg 20459 (May 9, 2019).

Any commercial shipment[1] being imported to the United States requires documentation including a commercial invoice and bill of lading. Using information from those and other documents, the importer must file with the United States Customs and Border Protection ("CBP") a Notice of Entry and an Entry Summary in which the product being imported is described, and the country of origin of the finished product, the appropriate tariff code, and the value of the merchandise is declared. A unique number, the entry number, is assigned to each such import, or entry.

Tariff codes determine the applicable duties. Tariff codes for hardwood plywood are distinct from tariff codes for softwood plywood. There is a unique duty-free tariff code for softwood plywood with outer plies of *Araucaria angustifolia*.

With respect to plywood, in addition to the Customs declaration, importers must also file with the U.S. Department of Agriculture ("USDA"), pursuant to the Lacey Act, a declaration (often called the PPQ 505) that sets forth, in relevant part, the scientific name of each plant (genus and species) in the plywood as well as the country(ies) where each species of wood was harvested. The country of harvest often differs from the country of origin, the latter being the location of manufacture or substantial transformation of the product in trade.

Statutory Background

The Lacey Act, Title 16, United States Code, Section 3371 *et seq.,* is the United States' oldest wildlife protection statute. Title 16, United States Code, Sections 3372(f)(l) and (d)(3)(A)(i), make it a crime for any person to knowingly import any plant product, including

---

[1] The term shipment and entry are used interchangeably throughout.  Each term refers to a shipping container or group of containers of merchandise imported under a single customs entry number on a single date.

plywood, unless the person filed upon importation the PPQ 505 declaration that contained, in relevant part, the genus and species of the wood in the plywood, and the country(ies) where the wood was harvested. Such declarations: (1) serve as a tool for combatting the illegal timber trade by ensuring importers provide required information; (2) are used to monitor compliance with Lacey Act prohibitions; and (3) are required to be submitted to the USDA. 7 C.F.R. § 357.3(c); 85 Fed. Reg. 12207 (March 2, 2020).

The Lacey Act, Sections 3372(a)(l) and 3373(d)(l)(B), further make it a crime for any person to, among other things, knowingly transport and sell any plant (including wood products such as plywood) knowing the plant was transported (including imported) in violation of any plant-related law or regulation of the United States.

Title 18, United States Code, Section 545 makes it a crime to knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

Defendant pled guilty, pursuant to the PA, to Counts One, Three, and Six of the Indictment. Count One charges Defendant with Conspiracy to Import Merchandise Contrary to Law, and to violate the Lacey Act, in violation of Title 18, United States Code, Section 371. Count Three charges Defendant with Smuggling, in violation of Title 18, United States Code, Section 545. Count Six charges Defendant with Failure to Declare, in violation of the Lacey Act, Title 16, United States Code, Sections 3372(f)(1) and 3373(d)(3)(A)(i).

## 2.  Factual Background

The underlying facts of each count of conviction are set forth with specificity in the Indictment and Defendant's factual proffer. That information is summarized herein and

4

augmented with selected documents attached hereto.

Participants in the Illegal Scheme

N. Quintana and his wife, Kelsy Quintana ("K. Quintana") (collectively "the Quintanas"), residents of Florida and citizens of the United States, were involved in the importation of plywood products for approximately 20 years. Previously, two companies that they controlled, Horizon Products International, Inc. ("HPI") and KNQ Corporation ("KNQ") were found by CBP to have imported plywood under incorrect tariff codes to avoid U.S. duties. Most recently, in 2017, HPI's judicial appeal of a CBP violation finding was rejected by the appellate court.

The Quintanas created at least eight additional entities (the "Shell Companies"), using the names of their friends and relatives as officers and agents, to continue importing plywood after HPI and KNQ were found to have violated customs laws.  The Shell Companies all provided false information to CBP and/or USDA about the country of origin, and/or the species of wood they were importing to avoid payment of the new (approximately 200%) duties.  Imports by the following five of the Shell Companies are included in overt acts in the Indictment:

1.      INL Supply Corp. ("INL" – "Shell Company #2" in the Indictment) was incorporated in Florida in September 2013, approximately when KNQ ceased importations. Ivette Lubian ("Lubian") was listed as registered agent and president and received monthly payments from INL starting in at least July 2016. Lubian is Quintana's former wife and the mother of his son.  Until approximately April 2017, when the anti-dumping and countervailing duties ("AD/CVD" or "new duties") went into effect, INL almost exclusively declared its imported wood products as hardwood plywood from China.  Starting in April 2017, INL began declaring many imports as being from countries other than China, and declaring some of its imports as softwood, including

duty-free *Araucaria angustifolia*. INL ceased importing in approximately July 2018, after CBP detained one of its shipments.

2.    Florida Panel Supply ("FPS" – "Shell Company #1" in the Indictment) was incorporated in Florida in February 2016. Lubian again was listed as registered agent and president. FPS's address when incorporated was listed as the same address as INL. Until April 2017, FPS declared all of its imports as hardwood plywood from China. Starting in April 2017, when the AD/CVD duties went into effect, and until FPS stopped importing plywood, FPS declared most of its imports to be hardwood plywood from countries other than China, or to be duty-free *Araucaria angustifolia*. FPS ceased importing in approximately August 2018, after CBP detained the INL shipment.

3.    Macro Distribution, Inc. ("Macro" – "Shell Company #3" in the Indictment) was incorporated in Florida in September 2018.   Antonio Leyva (also registered agent and president of another Shell Company, KAL Supply, Inc.), K. Quintana's brother-in-law, was listed as the registered agent and president of Macro. In December 2018, Macro began importing hardwood and softwood plywood, including some declared as *Araucaria angustifolia,* which Macro declared as country of harvest Malaysia, where it is not commercially grown, according to Malaysian authorities. Macro was importing until the Quintanas fled the United States in January 2021.

4.    EV Panel Corporation ("EV Panel" – "Shell Company #4" in the Indictment) was incorporated in Florida in September 2018. Emilia Valdez ("Valdez") was listed as the registered agent and president. Valdez and Lubian are friends on Facebook. Bank records reflect wire transfers from EV Panel to Lubian's company, FPS. In November 2018, EV Panel began importing hardwood plywood declared almost

exclusively as country of origin Malaysia or Sri Lanka. Occasionally, EV Panel declared the plywood as containing *Araucaria angustifolia*, country of harvest Sri Lanka or Malaysia, and occasionally as containing meranti or *Quercus rubra*, country of harvest Russia, where each of those species are also not known to grow. EV Panel was importing until January 2021.

5.      DBMAT, Inc. ("DBMAT" – "Shell Company #5" in the Indictment) was incorporated in Florida in October 2018.  Indira Perez, Marta Angelbello's daughter, was listed as the registered agent and president of DBMAT, as well as another Quintana-affiliated company, IPDC Distribution, Inc.  IPDC made monthly payments to K. Quintana from approximately August 2018 through April 2019. In December 2018, DBMAT began to import exclusively hardwood plywood declared as country of origin Malaysia. Occasionally, DBMAT declared the plywood as containing Araucaria angustifolia, country of harvest Malaysia. As of July 2020, DBMAT was still importing.

In addition, Laval Imports Corporation ("Laval" - referred to in the Indictment as the "Financial Shell Company") was incorporated as Laval Import, LLC (the name was changed in November 2012) in Florida in November 2011. Yailet Martin was listed as the registered agent and manager. Martin is Kelsy Quintana's sister and emergency contact on Hernandez's application to the Department of State for additional passport pages. Laval also does business as "Horizon Plywood."

Laval has made no plywood importations since one in February 2012. However, Laval, doing business as "Horizon Plywood," is the corporate entity used to sell, and receive payments for, plywood imported by the other Shell Companies. This money is then re-distributed to the Shell Companies that, in turn, make wire transfers to suppliers overseas.

In addition to the various corporations, Defendant's co-conspirators included K. Quintana, Marta Elena Angelbello (a former employee of Defendants who has plead guilty pursuant to a plea agreement in a related case, *United States v. Angelbello,* No. 1:23-cr-20413, and is scheduled to be sentenced on February 1, 2024), Chinese brokers Keven Au and Amy Wei, Malaysian facilitator William Khoo Wei Liam (who facilitated the transshipments from China), Malaysian brokers Durga Timber Traders, Pax Union Resources, and Nexus Timber, and a Malaysian Chamber of Commerce official., and suppliers in China, as well as others both within and outside the United States.

Structure of the Scheme and Defendant's Role

N. Quintana and his co-conspirators would order hardwood plywood from manufacturers in China that was later loaded into shipping containers in China, illegally imported into the United States, and then sold primarily by K. Quintana, but also by Marta Angelbello and others to buyers in the United States. N. Quintana was the primary contact with the overseas suppliers, arranging for the transshipments; K. Quintana handled all the finances, for all of the companies the Quintanas controlled, and was the point of contact with the primary U.S. buyer.

In some instances, the Quintanas and their co-conspirators caused the plywood to be shipped from China to the United States and to be falsely declared to the CBP as country-of-origin Russia, Vietnam, Chile, or Malaysia, to avoid the anti-dumping and countervailing duties owed on these country-of-origin China products.

In addition to falsely declaring plywood's country of origin, the Quintanas and their co-conspirators, in some instances, caused the plywood to be unloaded in a second country, primarily Malaysia, and then reloaded into new containers marked as country-of-origin Malaysia with a false certificate of origin of Malaysia before arriving in the United States.

In some instances, the Quintanas and their co-conspirators caused the plywood to be falsely declared to CBP and/or the USDA as *Araucaria angustifolia*, a softwood, thereby avoiding both the duties on country-of-origin China products as well as the general duty on softwood plywood products. And on some occasions, the Quintanas and their co-conspirators falsely declared to CBP that the plywood had a lower value than its actual value.

After being alerted to the possibility of prosecution by the government's executing a search warrant at the Quintanas' business on January 7, 2021, the Quintanas—but not their U.S. co-conspirators—fled the United States, first to Panama and then to Montenegro, on January 12, 2021, to avoid prosecution and the collection of more than $42 million in revenue due and owing to the United States.

<u>Applicable Legal Standards at Sentencing</u>

A sentencing court may "base its factual findings on undisputed statements in the PSR, because a defendant is deemed to have admitted any such statements that he has not objected to 'with specificity and clarity'." *Unites States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014). *See also United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) (a sentencing court is "free to adopt the findings of the [presentence report] without more specific inquiry or explanation" as long as the defendant has not made an affirmative showing that the information it contains is inaccurate. (quoting *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (citation omitted)).

In determining the appropriate sentence to be imposed upon a defendant convicted of a criminal offense, a court may conduct a broad inquiry "largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446-47 (1972). Such inquiry naturally includes the conduct for which the

defendant was convicted, but it also includes other conduct relevant to the crime. U.S.S.G. § 1B1.3.

## APPLICATION OF THE SENTENCING GUIDELINES

The government has no objections to the applicable guidelines range as set forth in the PSI and the PA. For the reasons set forth below and in the PSI and PA, and in its analysis of the factors set forth in 18 U.S.C. § 3553(a), the United States recommends the following U.S.S.G. guideline calculation:

| | |
|---|---|
| Base offense level - § 2Q2.1(a)<br>*Stipulated in the PA and supported by the PSI* | 6 |
| Special Offense Characteristic – § 2Q2.1(a)<br>Offense committed for pecuniary gain<br>*Stipulated in the PA and supported by the PSI* | +2 |
| Special Offense Characteristic – § 2Q2.1(3)(A)(ii)<br>Market value of more than $25 million<br>but not more than $65 million<br>*Stipulated in the PA and accepted in the PSI* | +22 |
| TOTAL | 30 |
| Acceptance of Responsibility – § 3E1.1<br>*Recommended by the government* | -3 |
| First Time Offender -- § 4C1.1(a)(1)(10)<br>*Stipulated in the PA* | -2 |
| ADJUSTED OFFENSE LEVEL | 25 |

Criminal History Category I, Zone D, 57-71 months

Count One and Count Six each carry a statutory maximum of five years.  Count Three carries a statutory maximum of twenty years. The government does not seek consecutive sentencing.

Counts One, Three and Six should be grouped together as they involve substantially the same harm under Section 3D1.2.  As such, the Combined Offense Level should not be increased under Section 3D1.4.

Pursuant to the PA, and in consideration of the collective terms of that agreement, the government recommends no other adjustment to or variance from the guideline range above. However, the terms of the PA include a requirement that Defendant provide full disclosure of financial assets and full cooperation with the government. As of the date of this Memorandum, neither of those two requirements have been fulfilled by Defendant.  This may be due to scheduling issues on the part of counsel.  However, any failure to fulfill requirements of the PA may affect the government's sentencing recommendation.

## ANALYSIS OF § 3553(a) FACTORS

Based on all the information before the Court, the government respectfully requests the Court impose a sentence consistent with the federal sentencing guidelines and the provisions of the PA. Under the facts present here, a term of imprisonment within the applicable guidelines range will be sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2).

**1. Promoting Respect for the Law**

First and foremost, the co-conspirators' conduct demonstrates a fundamental disrespect for the laws of the United States generally, as well as for the government's enforcement of the Lacey Act and customs laws specifically. Fundamentally, Defendant and his co-conspirators knew of the Lacey Act declaration requirements and their obligations to pay duties and tariffs. To avoid paying those duties and to accumulate wealth at the expense of other U.S. citizens and business competitors, Defendant and his co-conspirators created and submitted blatantly false

documentation and engaged in foreign corruption. Then, with prosecution looming on the horizon, Defendant fled the country leaving the wreckage of the scheme to fall on others he left behind, including family members. In doing so, Defendant and his co-conspirators denied Customs and Border Protection the ability to collect duties owed, as well as denied the Animal and Health Plant Inspection Service the ability to evaluate how much wood, of which species, and from what countries of harvest are in trade. Defendant and his co-conspirators interfered with the government's target prevention and enforcement work on trade flows with a high risk of illegally harvested timber.  In this case, the false documentation used to cover up that the product was manufactured in China also largely covered up the fact that much of the wood used in the product came from the high-risk source location of Eastern Russia.

The Defendant's conduct demonstrates a fundamental disrespect for the law. He and his co-conspirators did not commit a simple crime of opportunity, or one born of desperation.  Each time they had been caught previously, they created new corporations and more sophisticated methods of evasion.  With hundreds of thousands in assets, the Quintanas continued to find new ways to save more on import duties and enrich themselves further. Even now, the Quintanas have failed to disclose their remaining assets, instead advising that they do not recall the name of the bank they used while fugitives in Montenegro or where they held the IRA (early withdrawal from which is the cause of an existing tax debt to the IRS), and not disclosing the status of the funds taken to Montenegro, or from Panama, including the status of real estate the Quintanas purchased in Montenegro. The government notes that the Quintanas do not claim indigence and continue to employ private counsel.

### 2.  Nature and Seriousness of the Offense

Among those factors related to determining the length of a defendant's sentence are the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense. 18 U.S.C. § 3553(a)(1) and (2)(A). It is true that this offense could be deemed serious merely by dint of the amount of duties lost to the government, over $42 million. However, these lost duties also represent the loss of a level playing field for businesses.  Those U.S. business competitors of the Quintanas who complied with the law either found themselves at an approximately 200% price disadvantage while bringing in the same product from the same country of origin or found themselves at a similar disadvantage as they scrambled to compete for product from suppliers outside China with limited and/or lower quality production capacity.  The Quintanas' illicit cheap imports from China also put domestic plywood and timber producers at the very pricing disadvantage that the anti-dumping duties were implemented to eliminate. Finally, the Quintanas' lies covered up a supply chain, as noted above, that implicates the illegal deforestation of forest areas in Far East Russia.

### 3.  History and Characteristics of the Defendant

Defendant has no qualifying criminal history.  This lack of criminal history is accounted for in the aforementioned U.S.S.G. calculation. However, prior companies owned and controlled by the Quintanas were the subject of prior civil enforcement actions for similar duty avoidance types of conduct. The Quintanas are currently paying to the IRS taxes previously owed and not paid. Moreover, as noted above, the crimes to which the Defendant pled guilty are not isolated and short-lived.  The counts of conviction are but examples of conduct within a multi-year and multi-scheme conspiracy to enrich themselves by avoiding the payment of as much duty as possible.

### 4. **Deterrence**

Title 18, United States Code, Section 3553(a)(2)(B) requires the court to consider "the need for the sentence imposed ... to afford adequate deterrence to criminal conduct." In this case a sentence within the Guidelines range would continue to ensure adequate deterrence to the Defendant and to others who might otherwise be disposed to commit similar crimes.

Regarding specific deterrence for this Defendant, it bears repeating that the conspiracy to which N. Quintana pled guilty was not a singular or aberrant episode of criminality. It was a sophisticated series of schemes driven in large part by N. Quintana who found the foreign suppliers and worked directly with them to arrange the transshipments and false documents. N. Quintana engaged in a highly lucrative, illegal enterprise with a low risk of being caught (merely inspecting a piece of plywood at a port of entry would not reveal its illegality in the way drugs, guns or fake luxury goods might).  Prior civil enforcement actions did not deter Defendant from this general type of duty avoidance conduct. The government respectfully asks this Court to impose a sentence that will ensure that this Defendant does not repeat such criminal activities in the future. Such a sentence requires both a significant prison sentence and a financial penalty that goes beyond disgorging remaining ill-gotten gains.

As for general deterrence, the government submits that its requested sentence (57-71 months in prison, a forfeiture order as stipulated in the PA, the maximum period of supervised release with a special condition that the Defendant not work in the import/export field, and payment of storage costs), will send a message to others engaged in the trade in wood products that violating laws intended to promote legal timber harvest and a level playing field for that legal trade, will not be tolerated.

## GOVERNMENT'S RECOMMENDED SENTENCE

Assuming compliance with all terms of the PA, the government respectfully requests a sentence in the range of 57-71 months in prison. The government also requests entry of a forfeiture money judgment in the amount of $42,417,318.50, and an order of forfeiture for property, as specifically identified in the PA. Although it appears that the financial information provided by Defendant to date is incomplete, the government does not believe that N. Quintana has the ability to pay a fine in addition to the money judgment.

The government further requests that a term of three years' supervised release be imposed, during which period Defendant be precluded from engaging in employment in the import/export field in any manner.

Finally, the government requests that the Court order Defendant to pay, jointly and severally with K. Quintana, storage costs in the total amount of $1,630,324.46, as required pursuant to 16 U.S.C. § 3374(c) and as stipulated in the PA.

[This Space Intentionally Left Blank

## CONCLUSION

For all the foregoing reasons, the United States recommends a sentence within the applicable Guidelines range and consistent with the terms of the controlling Plea Agreement.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:     */s/ Katherine W. Guthrie*
Katherine W. Guthrie
Assistant United States Attorney
Court ID. A5502786
99 NE 4th Street, 6th Floor
Miami, Florida 33132
Tel: (305) 961-9117
Katherine.Guthrie@usdoj.gov

*/s/ Elinor Colbourn*
Elinor Colbourn
Senior Counsel for Wildlife Programs
Environmental Crimes Section
United States Department of Justice
DC Bar No. 430428

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 8, 2024, the foregoing and all exhibits thereto were filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:     */s/Katherine W. Guthrie*
KATHERINE W. GUTHRIE

16